## CHICAGO, R. I. & P. RY. CO. v. DENNIS.

No. 3905.   Opinion Filed November 17, 1914.

(144 Pac. 368.)

1. **MASTER AND SERVANT—Injury to Servant—Fellow-Servant Doctrine—Abrogation.** In an action for damages on account of personal injuries by a carpenter against a railway company for injuries inflicted upon him by the negligence of a colaborer, subsequent to statehood, the common-law doctrine of fellow servant, in so far as it affects the liability of the master for injuries to his servant, is abrogated by section 36, art. 9, of the Constitution, which provides: "And every such employee shall have the same right to recovery for every injury suffered by him for the acts or omissions of any other employee or employees of the common master that a servant would have if such acts or omissions were those of the master himself in the performance of a nonassignable duty."

2. **SAME—Negligence of Fellow Servant.** In such case the master is liable for the servant's injury by the negligent act or

omission of a fellow servant of the common master, although the master may have employed reasonable effort and precaution to provide competent fellow servants.

(Syllabus by Galbraith, C.)

*Error from District Court, Grady County;*

*Frank M. Bailey, Judge.*

Action by J. D. Dennis against the Chicago, Rock Island & Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*C. O. Blake, R. J. Roberts, W. H. Moore, J. G. Gamble,* and *K. W. Shartel,* for plaintiff in error.

*J. T. Dickerson* and *F. E. Riddle,* for defendant in error.

Opinion by GALBRAITH, C. The defendant in error commenced this action as plaintiff in the trial court to recover damages for personal injuries alleged to have been received on account of the carelessness and negligence of a fellow employee of the railway company. The charging part of the petition sets forth the cause of action as follows:

"Plaintiff alleges that on or about the 25th day of October, 1909, he was in the employ of said company in the capacity of a carpenter and was working for said company as a carpenter on said date assisting in the repairing of the depot of said defendant company in the town of Anadarko and state of Oklahoma. This plaintiff alleges that while so working, and without fault of his, and through the carelessness and negligence of an employee of said company, one Decatur Estes, and without fault on the part of the plaintiff, the said Decatur Estes, working as a carpenter at said time, suddenly and without notice to this plaintiff jerked a board from the floor of said depot, throwing the same in the face of this plaintiff, and that by reason of the wantonness, carelessness, and negligence of the defendant and its employee aforesaid this plaintiff was struck in the eye with a piece of nail or other substance and the sight of said eye entirely lost."

The answer of the defendant, first, denied the negligence of the company and its servants; second, charged that the in-

jury, if any, was the result of the negligence of the plaintiff; and, third, that the injuries of the plaintiff were the direct result of the risks and hazards of the work which he was employed to do, and that the same were open and well known to him during all the time of his employment. A reply was filed by the plaintiff denying the affirmative defense set up in the answer. The cause was submitted to the court and a jury, and a verdict returned for the plaintiff in the sum of $1,900.

The assignments of error are: First, the overruling of the motion for new trial; and, second, the entering of judgment upon the verdict in favor of the plaintiff and against the defendant.

It is argued that the trial court erred in denying the motion for a peremptory instruction, and the following reasons are urged in support of this assignment: First, because the doctrine of safe place does not apply; second, the accident was caused by the risks incident to the service; third, the cause of plaintiff's injury was not proved by plaintiff or known to him; fourth, the accident could not have happened in the manner described by plaintiff; and, fifth, the jury was not authorized to find negligence because the usual and not the safest methods were used in the work in which plaintiff was engaged at the time of his injury.

We agree with the plaintiff in error that the doctrine of safe place does not apply to this case. It was not relied upon by the defendant in error, and no breach of this obligation on the part of the railway company was charged in the cause of action set out in the petition. We cannot, however, agree with the plaintiff in error that the accident was proximately caused by the risk assumed by the defendant in error in accepting the employment, nor was it a contractual risk within the terms of the contract of employment. The law imposed the duty upon the railway company to furnish suitable and competent fellow servants to work with Dennis, and made it liable to him for injury due to the negligence or carelessness of his fellow em-

ployee. It was the negligence of the fellow servant, Estes, that was charged as primary negligence upon which recovery was had in the court below. Dennis was not expected to contemplate that a fellow servant would carelessly and recklessly jerk a board in taking up the floor where he was placed to work so as to put out his eye. Such an injury produced in such a manner was not within the ordinary hazard of the employment, nor was it a contractual risk because Dennis could not have contemplated at the time of his employment that his fellow servant would be reckless, careless, and unmindful of his safety while at work. We cannot agree with the contention of counsel for the railway company that the defendant in error did not prove or even know what put out his eye. It is true that he did not see the thing that struck his eye and destroyed the sight, but he related to the jury the circumstances surrounding the accident, and contended that it resulted proximately and directly from the recklessness and carelessness of his fellow servant, Estes, in jerking the board at the time he was leaning over it preparing to pry it loose. He proved the cause of the injury to the satisfaction of twelve men of ordinary intelligence composing the jury, who, by their verdict, found that his contention as to the cause of his injury was correct, and this finding was approved by the trial court in denying the motion for new trial. This being an issue of fact that was properly submitted to the jury for determination, we have no disposition to disturb the verdict.

We are not much impressed with the contention of counsel that it was impossible for the accident to have happened in the way that Dennis contended and the jury found, since this would be a violation of the law of physics, and to so hold would be to declare that the operation of the law of gravity was suspended at that time and place. Dennis' story does not seem at all improbable or impossible. He does not know whether it was the board that hit him in the eye or a nail or splinters from the board that caused the injury, but he does know that it was the board or a nail or splinters from the board, and that the force

recklessly applied to the board by Estes was the cause of the object flying to and striking his eye and putting it out. We do not consider that Dennis' story and the verdict of the jury is in any manner condemned by the laws of nature, and find this contention to be without merit.

We cannot agree with counsel in the last contention, that negligence could not be found by the jury because the usual and not the safest method was used in taking up the floor of this building. The company is not charged with negligence in the manner employed in removing the plank. It might be admitted that the method employed in this instance was the usual method of doing such work. It was the reckless and careless act of Estes in jerking the board at the time he did and in the way he did that was alleged to be the proximate cause of the injury.

Dennis testified in regard to the way the accident happened, on direct examination, as follows:

"Q. State to the jury what you were doing in October, 1909, at the time you allege in your petition you received an injury. A. We were taking up floor in the depot at Anadarko. Q. Who put you at that work? A. Mr. Hunt, the foreman of the job. Q. Who did he put to work with you? A. Three or four men were at work in there at that time; but me and Mr. Estes were engaged in tearing up this floor; just me and Mr. Estes were working together. Q. What did Mr. Hunt give you to work with? A. A claw hammer. Q. Tell the jury what you did there, and how you received the injury. A. We were taking up the boards. Mr. Estes was at one end, and I was at the other, and I may have begun at the middle of the plank and was going the other way, and he got his end loose, and we had the plank all loose except three or four feet of it, and I was at that end that had not been taken loose, at the west end, and he was at the east end near the ticket office— Q. West end? A. Yes, sir; we were on the west end of the depot, and I was fixing to pick it up. He had ten or twelve feet of the plank up. I don't know how long the planks were; twelve or fourteen feet long, I judge. And he took hold of his end of the plank just as I stooped over to put my hammer under it to pry it up, and he gave it a jerk this way, and some-

Opinion of the Court.

thing struck me in the eye and I could not see anything and don't know what it was . Q. In what manner did he give it a jerk? A. Took hold of it with his hands this way and jerked it loose (witness illustrating). Q. How far was he from you? A. Six or eight feet, or a little further. Q. Which way was he facing? A. Facing east; this way; facing west. Q. Was there any obstruction to keep him from seeing you? A. No, sir. Q. State to the jury whether or not in giving that jerk whether or not it was a sudden jerk? Mr. Low: Objected to as leading. By the Court: Sustained. Q. State how it was. A. It broke the plank loose very suddenly, right where I was at; like it was jerked with pretty hard force. Q. Where did it strike you? A. In the eye. Q. Which eye? A. Right eye. Q. Then what was done with you? A. I stood there for a few minutes, and I said my eye was hurt. Q. Did you have your eye treated? A. Yes, sir. Q. What did they get out of it, if anything? A. Took a good many pine splinters out of it, for one thing. Q. What effect did that have on your eye? A. Bad effect. Q. In what way? A. It put the right eye out, that's all. The eye is not worth anything to me at all. It's just out, that's all."

He testified on cross-examination as follows:

"Q. On which end of the plank did you go to work at? A. I commenced at the west end like, about middle ways of the plank possibly, and worked back to the other end, and Estes worked to the east end. Q. You went to the middle of the plank and worked to the west? A. Yes, sir. Q. And Estes went to the east end and worked towards the middle? A. That's where he was at; he was working on the east end of the planks. Q. How did he loosen the planks? A. What I loosened I pulled them up with a hammer, just put the hammer under the end of the planks and pulled it loose. Q. Put the claws under it and pulled it up? A. Yes, sir; that's the way I done, and he had the pinch bar pulling his up. Q. What kind of floor was it, single or double floor? A. Double floor, I think. Q Which one were you working on? A. Top floor. Q. How far had you pried it loose? A. Three or four feet, I think. Q. How did Estes get his loose? A. With a pinch bar. Q. How long was his pinch bar? A. Two and a half or three feet long. Q. How did he work with that? A. Put it under the plank and pried it up. Q. He was doing the same work you were doing? A. Yes, sir; he had a different tool to me. Q. Was that the way you had

been in the habit of taking up floors? A. No, sir; I generally took them up with a pinch bar. Q. And that's the way Mr. Estes was working? A. Yes, sir. Q. And the way Estes was working was the way you had been in the habit of doing that class of work? A. Yes, sir. Q. How long had you been working when the accident occurred? A. Not very long. Q. Did you know how much he had pried loose at the time of the accident? A. Six or eight feet, I think. Q. How long were the planks? A. Twelve, fourteen, or sixteen feet, I suppose; I don't know.' * *

* Q. He had pried his six or eight feet and you had pried up three feet? A. Yes, sir; about that. He was back at the east end. Q. He loosened about five or six feet? A. Yes, sir. Q. In working on the east, how close had he got to where you had commenced to loosen the plank? A. He commenced about the same place I did, and he went one way and I went the other, I think. Q. Do you know? A. He was working on the east end, and he got his end of it loose first. Q. His end was clear loose? A. Yes, sir. Q. And you had loosed about two feet of yours? A. Possibly more than that; three or four feet, I guess. Six or eight or more feet of the plank was loose when the accident occurred. Some little part of it was loose; all of the east end of it from where I was at back was loose. Q. And he was working with a pinch bar? A. Yes, sir. Q. And all at once something struck you in the eye? A. Yes, sir. Q. You were down on your knees? A. No, sir; standing on my feet. And as I stooped over like this to get the plank and pull it up he gave it a jerk. Q. What did he jerk with? A. His hands. Q. He didn't have a pinch bar then? A. No, sir; he did not need to use it then, as he had his end of the plank loose. Q. And something struck you in the eye? A. Yes, sir. Q. You don't know what it was? A. No, sir; but it was from the plank or some object off of the plank. I think it was the plank; the sudden jerk of the plank, and it came loose. It was either a nail or nail head, I cannot say which. I could not see anything after it struck my eye to tell what it was."

The petition charged primary negligence against the company on account of the carelessness and want of ordinary care of the fellow servant, Estes. The above evidence tends to support the charge and was sufficient to take the question of negligence to the jury. We therefore conclude that the court did not err in overruling the motion for a peremptory instruction.

Again, error is assigned in giving instruction No. 3 of the instructions of the court given to the jury. This instruction is a reasonably fair statement of the law applicable to the issues made by the pleadings and the evidence and is not properly subject to the criticism made against it in the brief of counsel for the plaintiff in error. The right of action in this case was based upon section 36 of article 9 of the state Constitution.

The authorities cited and discussed in the brief of plaintiff in error are not in point or controlling on the issues in the case at bar. The case of *St. L. & S. F. R. Co. v. Cox,* 31 Okla. 444, 122 Pac. 130, is in point and controlling authority. That was an action for damages on account of personal injuries resulting from the carelessness of a fellow employee. It was charged in that case that the plaintiff and his fellow servant were directed by the section foreman to carry a railway tie up an embankment, and while so doing, and while his back was turned, the fellow servant, without warning to the plaintiff, carelessly, negligently, and with a wanton disregard for the safety of the plaintiff, threw his end of the tie to the ground, thereby jerking the end held by the plaintiff from his hands, causing it to fall, striking plaintiff on the right leg, etc., whereby he was injured. The defense in that case was practically the same as in the case at bar. Chief Justice Kane, speaking for the court, said in answer to the contention of the plaintiff in error:

"Prior to statehood, this contention would have been well taken. *E. Van Winkle Gin & Mach. Co. v. Brooks,* 29 Okla. 351, 116 Pac. 908. But section 36 of article 9 of the Constitution was in force when this cause of action arose, and it casts additional duties upon railroad companies, street railway companies, interurban railway companies, and every person, firm, or corporation engaged in mining in this state, in their relations with their employees. That section provides, in part, that: 'The common-law doctrine of the fellow servant, so far as it affects the liability of the master for injuries to his servant, resulting from the acts or omissions of any other servant or servants of the common master, is abrogated as to every employee of every railroad company and every street railway company or interurban rail-

way company, and of every person, firm, or corporation engaged in mining in this state; and every such employee shall have the same right to recover for every injury suffered by him for the acts or omissions of any other employee or employees of the common master that a servant would have if such acts or omissions were those of the master himself in the performance of a nonassignable duty.' * * * The effect of the foregoing constitutional provision is to make the master liable for a servant's injury by the negligent acts or omissions of any other employee or employees of a common master, regardless of whether the master employed reasonable efforts and precautions to provide competent coemployees. The constitutional provision itself abrogating the common-law doctrine of fellow servant is so plain that there is very little ground for misunderstanding its scope. We think this case clearly falls within its purview, and the judgment of the court below must, therefore, be affirmed."

The above quotation is the law of the case at bar and is controlling. See, also, *Coalgate Co. v. Hurst,* 25 Okla. 588, 107 Pac. 657; *G., C. & S. F. R. Co. v. Taylor,* 37 Okla. 99, 130 Pac. 574.

We conclude that the exceptions should be overruled and recommend that the judgment appealed from be affirmed.

By the Court: It is so ordered.